1  JOHN F. MURTHA, ESQ.
2  **Nevada Bar No. 835**
   DANE W. ANDERSON, ESQ.
3  **Nevada Bar No. 6883**
   SETH J. ADAMS, ESQ.
4  **Nevada Bar No. 11034**
5  WOODBURN AND WEDGE
   Sierra Plaza
6  6100 Neil Road, Ste. 500
   Post Office Box 2311
7  Reno, Nevada  89505
8  Telephone:  775-688-3000
   Facsimile  :  775-688-3088
9  jmurtha@woodburnandwedge.com
   danderson@woodburnandwedge.com
10 sadams@woodburnandwedge.com
11
   Attorneys for Trustee
12 William A. Leonard, Jr.

13              UNITED STATES BANKRUPTCY COURT

14                    DISTRICT OF NEVADA

15                          * * *

16
   In re:                        Case No.  BK-13-51237-GWZ
17                               Chapter    7
   PAUL ANTHONY MORABITO,
18
19        Debtor.
   _____/
20 WILLIAM A. LEONARD, JR.        Adv. No. 15-5046
   Chapter 7 Trustee for the Estate of
21 Paul Anthony Morabito,
22
        Plaintiff,               **AMENDED COMPLAINT**
23
        vs.                      **(INJUNCTIVE RELIEF SOUGHT)**
24
25 PAUL ANTHONY MORABITO, an
   individual; EDWARD BAYUK,
26 an individual; JACKSON HOLE TRUST
   COMPANY, a Wyoming corporation,
27 as trustee of The Meadow Farms
28
   _____
   In re Morabito; Case No. 13-51237; Adversary Complaint; Page 1

Irrevocable Trust, a Wyoming Trust; VIRSENET,
LLC, a Delaware limited liability company;
USHF CELLULAR COMMUNICATIONS,
LLC, a Delaware limited liability company,
and LIPPES MATHIAS WEXLER FRIEDMAN
LLP, a New York limited liability partnership,

_____Defendants_____/

Plaintiff WILLIAM A. LEONARD, JR. as Chapter 7 Trustee of the Paul A. Morabito

bankruptcy estate ("Trustee" or "Plaintiff"), by and through his counsel Woodburn and Wedge,

complains against Defendants and alleges as follows:

## JURISDICTION, VENUE and PARTIES

1. This Chapter 7 case (the "Case") for Paul A. Morabito ("Debtor" or "Morabito"), an

individual, was commenced before the United States Bankruptcy Court for the District of Nevada

(the "Court") on June 20, 2013 (the "Petition Date" or "Commencement Date"), by way of an

*Involuntary Petition* (Docket No. 1) filed by JH, Inc., Jerry Herbst, and Berry-Hinckley Industries

("Petitioners").

2. On December 17, 2014, the Court entered an *Order Granting Motion for Summary

Judgment* (Docket No. 161) and an *Order for Relief* against the Debtor (Docket No. 162). An

Amended Order for Relief was entered on December 22, 2014 (Docket No. 168).

3. On December 18, 2014, Christina Lovato was appointed Trustee of the Debtor's

Estate (defined below) (Docket No. 163). At the first Section 341[1] meeting of creditors held on

January 23, 2015, however, an uncontested election of a replacement trustee took place and

William A. Leonard, Jr. was elected and appointed as the trustee in the Case. *See, Docket Nos. 220

and 221.*

///

---

[1]    Unless otherwise stated, all references to "Sections" herein shall be to the Bankruptcy Code appearing in
Title 11 of the U.S. Code; all references to a "Bankruptcy Rule" shall refer to the Federal Rules of Bankruptcy
Procedure; and all references to a "Local Rule" shall refer to the Local Rules of Bankruptcy Practice of the U.S.
District Court for the District of Nevada.

4.      Pursuant to the provisions of Bankruptcy Rule 7008, the Trustee advises the Court that this Adversary Proceeding relates to the Case. The Trustee has standing to assert the claims herein pursuant to Sections 323, 544, 548 and 704(a).

5.      By this Adversary Proceeding, the Trustee seeks (a) to recover a sixty percent membership interest in, or the right to acquire a sixty percent membership interest in, Defendant VIRSENET, LLC ("Virsenet") (the "Property") which Property[2] was the Debtor's property on the Petition Date and was not disclosed by the Debtor. Alternatively, the Property was the Debtor's property within one year before the Petition Date, but the Debtor transferred it, which transfer is avoidable by the Trustee. As such, the Trustee is seeking by way of this Adversary Proceeding; (i) a declaratory judgment of the Court determining that the Property now held by Edward Bayuk ("Bayuk") and/or The Meadow Farms Irrevocable Trust was property of the Debtor's bankruptcy estate pursuant to Section 541 (the "Estate") on the Petition Date and the imposition of a constructive trust for the Property, (ii) a judgment that the Property was property of the Debtor prior to the Petition Date and was conveyed by Debtor either with the actual intent to defraud existing creditors of the Debtor or without receiving reasonable equivalent value at a time when the Debtor was insolvent or as a result of which the Debtor was rendered insolvent, or the Debtor was about to engage in business or a transaction for which any remaining property of the Debtor was unreasonably small capital, which transfer (the "Transfer") the Trustee believes occurred in December 2012; (b) pending final judgment in this Adversary Proceeding, for the entry of a preliminary injunction (i) prohibiting, enjoining and restraining the Debtor, Jackson Hole Trust Company as the Trustee of The Meadow Farms Irrevocable Trust, and Bayuk from further transferring the Property; and (ii) prohibiting, enjoining and restraining Jackson Hole Trust Company as the Trustee of The Meadow Farms Irrevocable Trust, Bayuk, Virsenet, US HF Cellular

---

[2]     The definition of "Property" as used in this Adversary Proceeding, is intended to include Debtor's description of his interests in the "FCC Licenses" and/or Virsenet as described in the Debtor's SOFA (as defined herein) and Amended SOFA (as defined herein) and as he has testified to under oath, in whatever form those interests may be, or have been.

Communications, LLC ("USHF") and Lippes Mathias Wexler Friedman, LLP ("LMWF") from distributing any moneys or other consideration to or for the benefit of the Debtor without prior approval of the Court; (c) pre-judgment and post-judgment interest, attorneys' fees, and costs; and (d) such other and further relief as the Court deems just and equitable under the circumstances.

6.      The claims asserted herein arise under Bankruptcy Rules 7001 and 7065, Sections 105(a), 323, 541, 542, 544, 548(a)(1), 550(a), and 551, Nevada Revised Statutes ("NRS") §§ 112.180(1), 112.190, and 112.210, and, if the Court should determine that this action is governed by the laws of other states, the laws of such other states.

7.      The Court has jurisdiction over this Adversary Proceeding pursuant to 28 USC §§ 157, 1334(b), and 2201(a).

8.      The claims alleged herein are core proceedings under the provisions of 28 USC § 157(b)(2)(E), (H) and (O). The Trustee consents to the entry of final orders or judgment by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

9.      The Court is a proper venue for this case under the provisions of 28 USC §§ 1408 and 1409(a).

10.      Defendant Morabito is the individual Debtor in the Case and resides and does business in the State of California with a principal place of business at 8581 Santa Monica Boulevard, #708, West Hollywood, California 90069. Debtor is named as a Defendant in this Adversary Proceeding because this Complaint seeks (a) declaratory judgment that the Property is property of the Estate in that Debtor had legal and equitable title to the Property on the Petition Date and the imposition of a constructive trust over the Property, and (b) the entry of a preliminary injunction (i) prohibiting, enjoining and restraining the Debtor, Jackson Hole Trust Company as the Trustee of The Meadow Farms Irrevocable Trust, and Bayuk from further transferring the Property.

11.      Defendant Bayuk is an individual who resides and does business in the State of

California. Bayuk is named as an individual Defendant in this Adversary Proceeding because he may claim an interest in the Property that is the subject of this Adversary Proceeding and he, or Affiliates (as defined in Section 101(2)) in which he may have an interest or may control, are alleged to have been the recipients of fraudulent transfers by the Debtor. On information and belief, the Trustee alleges Bayuk is an "insider" of the Debtor (as defined in 11 USC §101 (31) and/or NRS 112.150(7)).

12.    Defendant Jackson Hole Trust Company ("Jackson Hole") is a Wyoming corporation and the trustee of The Meadow Farms Irrevocable Trust, a Wyoming Trust. (Hereinafter, unless the context requires a different reference, Jackson Hole and The Meadow Farms Irrevocable Trust shall be collectively referred to as "Meadow Farms." Meadow Farms conducts business in the State of California with a principal place of business at 8581 Santa Monica Boulevard, West Hollywood, California 90069. The Trustee is informed and believes that Bayuk is a grantor of Meadow Farms. Meadow Farms and Bayuk are named Defendants in this Adversary Proceeding because the Trustee is seeking a judgment against Meadow Farms for two forms of alternative relief: (a) that Meadow Farms' interest in the Property was obtained as a result of a fraudulent transfer by the Debtor; or (b) declaratory relief that any interest Meadow Farms holds in the Property is solely legal title to the Property, that the Debtor and the Estate hold the equitable title to the Property, and that the Court impose a constructive trust for the Property in favor of the Trustee and the Estate. In addition, the Trustee seeks against Meadow Farms and Bayuk: (a) temporary injunctive relief prohibiting, enjoining and restraining each of them, together with any other grantor, trustee, trust protector, and agent of Meadow Farms, from transferring or otherwise disposing or encumbering the Property; and (b) a temporary and permanent injunction from distributing, paying, or advancing any money or other consideration to or for the benefit of or on the account of the Debtor from the Property. On information and belief, the Trustee alleges Meadow Farms is an "insider" of the Debtor (as defined in Section 101 (31) and/or NRS 112.150(7)).

1

2

3        13.    Defendant Virsenet is a Delaware limited liability company that conducts business

4   in the State of California with a principal place of business at 8581 Santa Monica Boulevard, West

5   Hollywood, California 90069.  Virsenet was previously known as VTS COMMUNICATIONS

6   ("VTS").  Virsenet is named as a Defendant in this matter because it may claim an interest in the

7   Property.    Additionally,  this  Complaint  seeks  temporary  and  permanent  injunctive  relief

8   prohibiting, enjoining, and restraining Virsenet, together with its members, officers, managers,

9   employees, and agents, from distributing, paying, or advancing any money or other consideration to

10  or for the benefit of or on the account of the Debtor on account of his ownership, or former

11  ownership, of the Property that is the subject of this Adversary Proceeding.  On information and

12  belief, the Trustee alleges Virsenet is an "insider" of the Debtor (as defined in 11 USC §101 (31)

13  and/or NRS 112.150(7)).

14        14.    Defendant USHF is a Delaware limited liability company that conducts business in

15  the State of California with a principal place of business at 8581 Santa Monica Boulevard, West

16  Hollywood, California 90069.  USHF was previously known as USHF COMMUNICATIONS

17  COMPANY, LLC.  USHF is named as a Defendant in this Adversary Proceeding with regard to the

18  claim for relief seeking injunctive relief prohibiting, enjoining, and restraining it and its members,

19  managers, officers, directors, and agents from distributing, paying, or advancing any money or

20  other consideration to or for the benefit or on the account of the Debtor on account of his

21  ownership, or former ownership, of the Property that is the subject of this Adversary Proceeding.

22        15.    LMWF is a law firm located in Buffalo, New York which at all times pertinent to

23  this Complaint represented the Debtor, Bayuk, USHF, Virsenet, Meadow Farms, and other

24  affiliates and insiders of the Debtor.  In addition, Dennis Vacco ("Vacco'), an attorney with

25  LMWF, at various times pertinent to this Complaint, acted as a director, officer, and/or agent of the

26  other Defendants and other affiliates and insiders of the Debtor.  Upon information and belief, the

27  Trustee alleges that LMWF represented the Defendants with regard to the Transfer and both

28

provided legal services with regard to the Transfer and also facilitated the distribution of moneys related to the Transfer through the use of its trust accounts. LMWF is named as a Defendant in this matter with regard to the claim for relief seeking injunctive relief prohibiting, enjoining, and restraining it, and its principals, attorneys, employees, and agents from distributing, paying, or advancing any money or other consideration to or for the benefit or on the account of the Debtor on account of his ownership, or former ownership, of the Property that is the subject of this proceeding.

## GENERAL ALLEGATIONS

16.    The Trustee repeats and realleges each and every allegation contained in Paragraphs 1 through 15, above, and incorporates them herein the same as if they were set forth in their entirety.

**A.    The Events Leading to the Filing of the Involuntary Petition.**

17.    The Debtor and other entities in which he had interests (the "Morabito Parties") and the Petitioners entered into a transaction involving a sale of stock to the Petitioners. A dispute related to the stock sale arose and the Morabito Parties filed a lawsuit against Petitioners on December 3, 2007. The lawsuit was captioned *Consolidated Nevada Corp., et al. v. JH et al.,* and was filed in Department 6 of the Second Judicial District Court in and for the County of Washoe (the "State Court"), Case No. CV07-02764 (together with all claims and counterclaims, the "State Court Action"). The Petitioners filed numerous counterclaims against the Morabito Parties including, but not limited to, claims for fraud in the inducement, misrepresentation, and breach of contract.

18.    The State Court ultimately awarded judgment in favor of the Petitioners and against the Morabito Parties (including the Debtor) in the amount of $149,444,777.80, representing both compensatory and punitive damages (the "State Court Judgment"). The State Court Judgment was entered by the Court on August 23, 2011.

19.    The Morabito Parties filed an appeal of the State Court Judgment (the "Appeal").

While the Appeal was pending, the Petitioners and the Morabito Parties entered into a Settlement Agreement and Mutual Release dated November 30, 2011 (the "Settlement Agreement"). The Settlement Agreement provided, among other things, that the Morabito Parties were to execute a Confession of Judgment and a Stipulation to Confession of Judgment in the amount of $85,000,000 (referred to collectively as the "Confessed Judgment") in lieu of the State Court Judgment. The Settlement Agreement provided that, upon breach of the Settlement Agreement, the Petitioners could file, *ex parte* and without notice, the Confessed Judgment with the State Court.

20.    The Petitioners alleged the Morabito Parties breached the terms of the Settlement Agreement. The Trustee is informed and believes, and on that basis alleges, the Morabito Parties requested that Petitioners forbear from exercising their rights and remedies under the Settlement Agreement. The parties entered into a Forbearance Agreement dated March 1, 2013.

21.    The Forbearance Agreement provided that if the Morabito Parties defaulted under the terms thereof the Petitioners would be entitled to deem the Forbearance Agreement null and void ab initio and they could then enforce any rights or remedies they had under the Settlement Agreement. The Petitioners alleged the Morabito Parties breached their obligations under the Forbearance Agreement. The Petitioners filed the Confessed Judgment that indebted the Morabito Parties, jointly and severally, to the Petitioners in the amount of $85,000,000.00. The Confessed Judgment was filed on June 18, 2013 and entered onto the judgment roll.

22.    On June 20, 2013, the Petitioners filed the Involuntary Petition commencing the Case.

**B.    Initial Formation of Certain Defendants.**

23.    On October 14, 2011, a Limited Liability Company Agreement for USHF (then known as USHF Communications Company, LLC), was executed by Virsenet (then known as VTS Communications, LLC), with Bayuk and the Debtor as Managers of USHF. Virsenet was listed on Schedule A of the agreement as owning one hundred percent of the membership interests for an initial capital contribution of one hundred dollars. The officers of USHF as listed on Schedule B of

the agreement included the Debtor as Chief Executive Officer, Vacco as Secretary and Treasurer, and Bayuk as President. A true and correct copy of the Limited Liability Company Agreement is attached hereto as **Exhibit 1**.

24.     Subsequently, on November 3, 2011, a Limited Liability Company Agreement for Virsenet (then known as VTS) was entered into by Bayuk as the holder of one hundred percent of the membership interests of Virsenet with an initial capital contribution of one hundred dollars. The officers listed on Schedule B included the Debtor as CEO, Vacco as Secretary and Treasurer, and Bayuk as President. A true and correct copy of the Limited Liability Company Agreement is attached hereto as **Exhibit 2**. Notwithstanding this claim of one hundred percent ownership by Bayuk, the Trustee is informed and believes based upon the Debtor's conduct, the conduct of the other Defendants and filings with the Federal Communications Commission (the "FCC"), all as detailed hereinafter, and on that basis alleges, that at all times going forward until the Transfer the Debtor managed, controlled and owned the Property, either directly or indirectly.

25.     The Trustee is informed and believes that Meadow Farms was formed sometime between October 2011 and December 2012.

**C.     The "Property" That is the Subject of This Adversary Proceeding.**

26.     Prior to October 2011, an entity known as SHIPCOM, LLC, an Alabama limited liability company ("ShipCom"), is reported by the Debtor to have been the United States' only provider of high frequency SSB radiotelephone ship-to-shore services through a network of public coast stations utilizing certain licenses issued by the FCC (the "FCC Licenses"), U.S. patents, and patents pending and other valuable support assets.

27.     Prior to October 2011, the membership interests of ShipCom were owned or controlled one hundred percent by Robert S. Block (either in his individual name or through his family trust) ("Block"), Rene Stiegler, III ("Stiegler"), and Tim McEvoy ("McEvoy").

28.     On October 14, 2011, a Letter Agreement (the "Letter Agreement") was entered into by USHF as "Purchaser" and Block and Stiegler as "Sellers" for eighty percent of the membership

interests of ShipCom. The Letter Agreement provided for an assigned enterprise value of $31,228,000 for ShipCom with Stiegler and Block receiving total consideration of $6,228,000 comprised of (i) $750,000 in cash, (ii) a $5,478,000 note less assumption of Related Party loans of $3,478,000, (iii) $800,000 cash to Stiegler, (iv) $1,000,000 cash to Interoperability Technical Corporation, and (v) $200,000 to an entity known as Spindel. The Letter Agreement contemplated a capital raise of no less than $30,000,000 for twenty percent of the membership interests of ShipCom from "Investors", and a lease with ShipCom Nevada, LLC for real property in Mobile, Alabama, where transmitter equipment was located at $6,000 per month for 36 months with an option to purchase for $1,000,000. A true and correct copy of the Letter Agreement is attached hereto as **Exhibit 3**.

29. On November 1, 2011, an Amendment to Letter Agreement (the "Amendment") was entered into by USHF and Block and Stiegler. (The Letter Agreement and the Amendment to Letter Agreement are defined collectively as "Letter Agreement" in the Purchase Agreement referenced below). The Letter Agreement provided for pre-closing payments of $36,000 to ShipCom by USHF following successful completion of a Beta Test to assist in financing ShipCom's operations between the effective date of the Letter Agreement and the closing of the transaction with it increasing to a minimum of $40,000 from and after February 1, 2012 (which includes $4,000 as a payment to Stiegler as salary). A true and correct copy of the Amendment is attached hereto as **Exhibit 4**.

30. On November 12, 2011, a Pledge Agreement and an Escrow Agreement (the "Pledge/Escrow Agreements") were entered into by USHF and Stiegler and Block under which Stiegler and Block pledged and placed in escrow with LMWF the eighty percent membership interests in ShipCom, the subject of the Letter Agreement. The Pledge/Escrow Agreements provided security for performance by Block and Stiegler and in exchange for the consideration provided under the Letter Agreement, including the monthly payments referenced above. True and correct copies of the Pledge/Escrow Agreements are attached hereto as **Exhibits 5 and 6**.

31.    On February 6, 2012, USHF, Block, and Stiegler executed a Confidential Summary of Proposed Principal Terms Between Purchaser and Sellers (the "Term Sheet").

32.    On February 23, 2012, USHF, ShipCom, Block, and Stiegler executed the ShipCom Membership Interest Purchase Agreement (the "Purchase Agreement") amending, restating, and replacing the Letter Agreement and the Term Sheet.  A true and correct copy of the Purchase Agreement is attached hereto as **Exhibit 7**.

33.    Upon information and belief, sometime after February 23, 2012, but on or before June 1, 2013, the transaction provided for in the Purchase Agreement closed and USHF acquired eighty percent of the membership interests in ShipCom.  As of the date of the Purchase Agreement, USHF was wholly owned by Virsenet.  Sometime after the date of the Purchase Agreement and before closing, VTS changed its name to Virsenet

**C.    The Debtor's Acquisition, Control and Ownership of the Property.**

34.    Although USHF was the acquiring party under the Letter Agreement and Purchase Agreement and the entity obligated to pay the $36,000/$40,000 monthly overhead fees to ShipCom, on December 1, 2011, the Debtor wire transferred $36,016 from his personal bank account ending in 620 with BMO Harris Bank to ShipCom as and for the December 2011 monthly overhead fee due under the terms of the Letter Agreement.  A copy of a wire transfer memo is attached hereto as **Exhibit 8**.

35.    On January 1, 2012, the Debtor wire transferred $36,000 from his personal bank account ending in 9217 with Wells Fargo to ShipCom as and for the January 2012 monthly overhead fee due under the terms of the Letter Agreement.  A true and correct copy of a wire transfer memo is attached hereto as **Exhibit 9**.

36.    On January 9, 2012, Virsenet filed a Transfer of Control application with the FCC in which it reported:

> In the description of the transaction attached to the application as filed, it was stated that VTS Communications, LLC ("VTS"), the transferee, will own an 80 percent membership interest in ShipCom, LLC ("ShipCom"), the licensee, and that

VTS is 100 percent owned by Edward Bayuk.

> VTS has decided to alter its ownership structure. Edward Bayuk will continue to own 100 percent of the voting interest in VTS and will control VTS. He will now own 20 percent of the equity in VTS. **Paul Morabito and Raymond Whiteman will now own sixty percent and 20 percent respectively of the equity in VTS.** The interests held by Mr. Morabito and Mr. Whiteman will, however, be non-voting in nature. Thus, Mr. Bayuk will still control VTS. (Emphasis added.)

A true and correct copy of a portion of an FCC report on the January 9, 2012, Transfer of Control application containing the information quoted above is attached hereto as **Exhibit 10**.

37.    On January 13, 2012, RAYMOND WHITEMAN (referenced in the January 9, 2012, Transfer of Control application) ("Whiteman") deposited $200,000 into the Debtor's client trust account maintained by LMWF, the Debtor's lawyers, (the "LMWF/Morabito Trust Account"). A true and correct copy of the LMWF ledger for the LMWF/Morabito Trust Account is attached hereto as **Exhibit 11**.

38.    On February 2, 2012, LMWF paid $36,000 from the LMWF/Morabito Trust Account to ShipCom as and for the February 2012 monthly overhead fee due under the terms of the Letter Agreement. LMWF paid another $4,000 to ShipCom from the LMWF/Morabito Trust Account on February 8, 2012.

39.    On February 14, 2012, LMWF paid $15,552.32 from the LMWF/Morabito Trust Account to Holland & Knight, LLP ("Holland & Knight") as counsel for USHF and Virsenet, which was the law firm that filed the Transfer of Control application with the FCC that provided that the Debtor owned a sixty percent interest in Virsenet (then VTS).

40.    Pursuant to the Purchase Agreement entered on or about February 23, 2012, USHF was still obligated to pay $36,000 to ShipCom for its monthly overhead costs and an additional

$4,000 per month to cover Stiegler's salary pending closing of the transaction contemplated by the Purchase Agreement. *See, Exhibit 7, p. 1.*

41.     Although USHF was the acquiring party under the Purchase Agreement obligated to pay $40,000 to ShipCom for its monthly overhead fees and Stiegler's salary, on March 5, 2012, LMWF paid $40,000 from the LMWF/Morabito Trust Account to ShipCom as and for the March 2012 monthly overhead fee due under the terms of the Purchase Agreement.

42.     On April 2, 2012, LMWF paid $40,000 from the LMWF/Morabito Trust Account to ShipCom as and for the April 2012 monthly overhead fee due under the terms of the Purchase Agreement.

43.     On April 6, 2012, Holland & Knight, on behalf of Virsenet, filed another Transfer of Control application with the FCC in which it reported:

> It was previously proposed that control of ShipCom, LLC ("ShipCom") and associated radio station will be transferred to VTS Communications, LLC ("VTS"), a Delaware limited liability company. VTS's name has been changed to Virsenet, LLC ("Virsenet").

> Virsenet's wholly owned subsidiary, USHF Communications Company, LLC, also a Delaware limited liability company, will own an 80 percent membership interest in ShipCom. Virsenet is now owned as follows: **Sixty percent of its one class membership interests, and control, is held by Paul Morabito.** Twenty percent each of its membership interests is held by Raymond Whiteman and Edward Bayuk. A 12 percent interest in ShipCom will be held by Robert Block and an 8 percent interest will be held by Rene Stiegler, III. Mr. Block and Mr. Stiegler presently hold interests in ShipCom. (Emphasis added.)

A true and correct copy of a portion of an FCC report of the April 6, 2012, Transfer of Control application containing the information quoted above is attached hereto as **Exhibit 12**.

/ / /

/ / /

/ / /

44.    As of April 6, 2012, the ownership interests and affiliations between VTS/Virsenet, USHF, and ShipCom can be illustrated as follows:



45.    On April 11, 2012, LMWF, as counsel for Debtor, submitted a personal financial statement to Bank of America (the "BofA Financial Statement") in an attempt to convince Bank of America to settle a lawsuit Bank of America had filed against him.  A true and correct copy of the

///

BofA Financial Statement forwarded by Vacco to counsel for Bank of America is attached hereto as **Exhibit 13**. On page 4 of the BofA Financial Statement, the Debtor represented:

| Location, Description, Type of Interest & Source of Valuation | % | Year Acquired | Date of Valuation | Present Valuation |
|---|---|---|---|---|
| FCC Licenses in LMWF Pledged Escrow.[3] FMV based on sale of 2% to P/E Firm 4/12[4] | 60 | 2011 | 2012 | $80,850,000 |

46.     The eighty percent membership interests in ShipCom being purchased by USHF under the Purchase Agreement were placed in the Pledged Escrow. In the BofA Financial Statement, the Debtor was representing to Bank of America that his sixty percent interest in Virsenet had a value of $80,850,000.

47.     On April 16, 2012, LMWF established a trust account for USHF (the "LMWF/USHF Trust Account"). On that same day, Jacobs Holdings, LLC ("Jacobs") and CD Holding Co., LLC ("CD Holdings", and collectively with Jacobs, "JJ/CD") each deposited $1,367,500 into the LMWF/USHF Trust Account. A true and correct copy of the LMWF ledger for the LMWF/USHF Trust Account is attached hereto as **Exhibit 14**. The Trustee is informed and believes that this represented the consideration to Virsenet for a two percent purchase of the USHF membership interests by JJ/CD.

48.     On April 20, 2012, $2,000,000 of the moneys deposited into the LMWF/USHF Trust Account by JJ/CD was transferred by LMWF to the Debtor's Bank of Montreal account ending in 620. Between April 27, 2012 and August 14, 2012, the Debtor wire transferred at least $1,312,000 from his Bank of Montreal account to his Wells Fargo account ending in 5330.

49.     The $80,850,000 value for the asset described in the BofA Financial Statement represents a sixty percent interest in Virsenet, which interest corresponds to an imputed forty-eight

---

[3]     The "Pledged Escrow" referenced in the BofA Financial Statement is that established pursuant to the Pledge/Escrow Agreements.

[4]     Another form of the BofA Financial Statement has been provided to the Trustee by the Debtor which claims a value of the sixty percent of $120,000,000 predicated upon a FCC auction analysis. The Trustee is relying upon the BofA Financial Statement because it was produced by Vacco and LMWF pursuant to a document request as being the document provided to Bank of America in the settlement negotiations.

percent interest in USHF (60 percent of 80 percent). The sale of two percent of USHF in April 2012 to JJ/CD for $2,735,000 corresponds to an enterprise value of USHF of $136,750,000. Given the value of two percent, the ninety-eight percent value of the Virsenet interest in USHF would have been worth $134,015,000. The reference to a sale in the BofA Financial Statement (Exhibit 13) in April 2012 is to the two percent sale to JJ/CD. In the April 2012 BofA Financial Statement, the Debtor represents that he held a sixty percent interest in Virsenet in escrow with LMWF, which based upon the sale to JJ/CD, would have been worth $80,409,000, nearly identical to the value claimed in the BofA Financial Statement.

50.    On April 30, 2012, LMWF paid $40,000 from the LMWF/USHF Trust Account to ShipCom as and for the May 2012 monthly overhead fee due under the terms of the Purchase Agreement. All future monthly overhead fees due ShipCom were paid by LMWF from the LMWF/USHF Trust Account.

51.    On October 22, 2012, the Debtor sent a letter to the FCC in which he identified himself as the Chairman of USHF ("FCC Letter"). A true and correct copy of the FCC Letter is attached hereto as **Exhibit 15**. The FCC letter indicates USHF's address is 8581 Santa Monica Blvd., Suite 708, Los Angeles, California 90069. The Debtor's address as reflected in the Bankruptcy Docket is 8581 Santa Monica Blvd., #708, West Hollywood, California 90069.

52.    On November 30, 2012, Holland & Knight, as counsel to several of the Defendants, including Meadow Farms, filed a Transfer of Control application with the FCC in which it reported:

> It is proposed that control of ShipCom, LLC ("ShipCom") and its associated HF radio stations will be transferred to the Meadow Farms Trust, a Delaware Trust (the "Trust").
>
> . . .
>
> ShipCom is now owned as follows. An eighty percent interest in ShipCom is held by Virsenet, LLC ("Virsenet"), a Delaware limited liability company through Virsenet's wholly owned subsidiary, USHF Communications Company, LLC, also a Delaware limited liability company. **Sixty percent of Virsenet's one class of membership interests, and control, is held by Paul Morabito.** Twenty

percent each of its membership interests and held by Raymond Whiteman and

Edward Bayuk. A twelve percent interest in ShipCom is held by Robert Block and an 8 percent interest is held by Rene Stiegler, III.

**It is proposed that Paul Morabito will sell his sixty percent interest in Virsenet to the Trust.** Edward Bayuk will also assigning his twenty percent interest in Virsenet to the Trust. Thus, the final ownership interests in Virsenet will be eighty percent held by the Trust and twenty percent held by Whitman [sic]. All other ownership interests in ShipCom are unchanged. (Emphasis added.)

A true and correct copy of a portion of an FCC report of the November 30, 2012, Transfer of Control application containing the information quoted above is attached hereto as **Exhibit 16**.

53.     According to the November 30, 2012, Transfer of Control application, Meadow Farms' address is 8581 Santa Monica Blvd., #708, West Hollywood, California 90069, the same address used for USHF in the FCC Letter and the same address identified in the Case docket as the Debtor's business address.

54.     In 2013, the year immediately following the Debtor's purported transfer of his interests in Virsenet to Meadow Farms, Virsenet reported paying the Debtor $1,610,378 in nonemployee compensation, and USHF reported paying the Debtor $325,175 in nonemployee compensation. True and correct copies of the 2013 Misc. Inc. 1099's are attached hereto as **Exhibits 17 and 18**.

55.     In 2014, USHF reported paying the Debtor $430,707.92 in nonemployee compensation. A true and correct copy of the 2014 Misc. Inc. 1099 is attached hereto as **Exhibit 19**.

56.     Notwithstanding what was reported in the November 30, 2012, Transfer of Control application, according to the FCC, as of June 25, 2015, Virsenet is still owned by Bayuk (20 percent), Whiteman (20 percent), and the Debtor (60 percent). A true and correct copy of an FCC

Ownership Statement for Virsenet dated as of June 25, 2015, evidencing these ownership percentages, is attached hereto as **Exhibit 20**.

57.    Purportedly, sometime in May 2013, an Amended and Restated Limited Liability Company Agreement of US HF Cellular Communications ("USHF Restated Operating Agreement") was entered into by and among USHF, Virsenet, and an entity known as JJ/CD CAPITAL, LLC ("JJ/CD Capital"). A true and correct copy of the USHF Restated Operating Agreement is attached hereto as **Exhibit 21**.[5] It is believed that JJ/CD Capital is the successor to JD/CD. According to Exhibit B to the USHF Restated Operating Agreement, JJ/CD Capital obtained a thirty percent membership interest in USHF for a total capital contribution of $10,976,452 and Virsenet retained a seventy percent interest in USHF.

58.    Pursuant to ¶ 2.13 of the USHF Restated Operating Agreement, Virsenet, the Debtor, and Bayuk agreed as follows:

> Investment Opportunities. Each of Virsenet, **Paul A. Morabito**, Edward Bayuk and all Affiliates of each of the foregoing agrees to submit each opportunity that would be reasonably related to the Business, including all investments or investment opportunities of any kind that involve or include high frequency radio communications or related opportunities (each, an "**Investment Opportunity**") that it/he/she becomes aware of to the Company on an exclusive right of first refusal basis and except as provided herein shall not have the right to hold any such Investment Opportunity for their own account or to recommend such Investment Opportunity to persons other than the Company. (Emphasis added.)

*See, Exhibit 21, p. 12.* There is no indication in the USHF Restated Operating Agreement why the Debtor would agree to pass up investment opportunities or what consideration he may have received for the pledge even though he claims to have transferred his interest in Virsenet (or USHF)

///

in December 2012, approximately 5 months prior to the execution of the USHF Restated Operating Agreement.

59.    On June 25, 2013, two days after the Petition Date, JJ/CD Capital filed a Transfer of Control application with the FCC, a true and correct copy of an FCC report of which is attached hereto as **Exhibit 22**. The application states that "the purpose of this transaction is to capitalize US HF Cellular Communications," but it does not explain how and when JJ/CD Capital would capitalize USHF.

60.    In the Debtor's Statement of Financial Affairs (Docket No. 211) (the "SOFA') filed on January 14, 2015, in response to question 10(b) (list all property transferred by the debtor in the last 10 years to a self-settled trust or similar device), the Debtor reported:

| Name of Trust or Other Device | Date of Transfer | Amount of Money or Description |
|---|---|---|
| Edward Bayuk | December, 2012 | Paul Morabito, an individual, transferred his 60% membership interest in Virsenet, LLC to Edward Bayuk, as Grantor of the Meadow Farms Irrevocable Trust for $600.00 |

A true and correct copy of the Debtor's response to question 10(b) is attached hereto as **Exhibit 23**.

61.    The Debtor declared under penalty of perjury that he read the answers contained in his SOFA and any attachments thereto and that they were true and correct.

62.    On February 24, 2015, the Debtor filed an Amended Statement of Financial Affairs (Docket No. 238) ("Amended SOFA"). In response to question 10(b), the Debtor reported:

///

---

[5]    The Amended and Restated Limited Liability Company Agreement attached hereto as Exhibit 21 is unsigned. The Trustee is informed and believes the agreement has, in fact, been fully executed by the parties. The Trustee, however, does not admit the agreement was signed in May of 2013.

| Name of Trust or Other Device | Date of Transfer | Amount of Money or Description |
|---|---|---|
| Edward Bayuk | December, 2012 | Paul Morabito, an individual, failed to perform on his agreement to acquire and capitalize an entity for a 60% interset [sic] in VTS Communications LLC from Meadow Farms Irrevocable Trust, accepting $600 as consideration for his original $60 undertaking. |

A true and correct copy of the Debtor's response to question 10(b) is attached hereto as **Exhibit 24**.

63.     As set forth in both the SOFA and the Amended SOFA, the Debtor claims that he never exercised the option to purchase the sixty percent interest in Virsenet and in December 2012 effectuated the Transfer of his interest, either directly to or indirectly through Bayuk, to Meadow Farms for $600, being ten times his original $60 investment.

64.     On Debtor's Schedule I, the Debtor stated that he receives $31,250 a month as income, salary, and commissions as a "Consultant-Advisor" and that his employer's address is 8501 Santa Monica Boulevard, #517, West Hollywood, CA 90069.

65.     At Debtor's 341 examination on June 25, 2015, under questioning by Trustee's Counsel regarding the Pledge/Escrow Agreements and the April 2012 BofA Financial Statement, the Debtor testified as follows:

MR. MURTHA:     And you don't have a 60-percent interest in something worth either 120 million dollars or $80,850,000?

MR. MORABITO:     Today or at this time?

MR. MURTHA:     When these were prepared?

MR. MORABITO:     I believe at the time the prospective value of the option I had was worth that.

A true and correct copy of p. 124, lns. 3-10 of the 341 Transcript is attached hereto as **Exhibit 25.**

66.    The Debtor has yet to file his 2014 tax return or produce all of his 2015 bank statements, so it is unknown what distributions or compensation the Debtor has received in 2014 or 2015 on account of his ownership interest in the Property in 2014 or 2015.

67.    As of the Petition Date, the purported ownership interests and affiliations between VTS/Virsenet, USHF, and ShipCom can be illustrated as follows:



**D.    The Property had Significant Value at the Time it was Purportedly Transferred to Meadow Farms.**

68.    The October 2011 Letter Agreement, which was ultimately amended, restated, and replaced by the Purchase Agreement in February 2012, indicated that ShipCom had an enterprise value of $31,228,000.

69.    In the BofA Financial Statement LMWF submitted to counsel for Bank of America on behalf of its client, the Debtor represented his sixty percent interest in Virsenet (VTS) was worth $80,850,000.

70.    At Debtor's 341 examination, Debtor testified to a value for his interest in the sixty percent membership interest in Virsenet (VTS) in April 2012 of from $80,850,000 to $120,000,000, yet less than 8 months later Debtor claims to have transferred the interest for $600.

71.    The USHF Restated Operating Agreement with a purported effective date of May 2013, indicates JJ/CD Capital made a total capital contribution by that date of $10,976,452 to USHF in exchange for its thirty percent interest in USHF.  This implies an enterprise value of $36,588,173, of which a sixty percent membership interest in Virsenet would have an implied value of $15,367,033.

72.    In June 2014, USHF either issued or proposed to issue a Private Offering Memorandum in which it offered to sell up to ten percent of its membership interests for $50,000,000 in unit increments of $500,000 each.  A true and correct copy of the draft cover page and a summary of the offering are attached hereto as **Exhibit 26**.

73.    At all times material hereto, there was and is at least one or more creditors who held unsecured claims against the Debtor as of the Transfer and/or as of the Petition Date, including the following creditors: Petitioning Creditors, Hartford Fire Insurance Company and Bank of America.

## FIRST CLAIM FOR RELIEF

### Declaratory Relief; Determination of Estate's Interests in Property; Turnover of Property- Sections 105, 323, 541, and 542 Against Defendants Morabito, Bayuk, Virsenet, and Meadow Farms

74.    The Trustee repeats and realleges each and every allegation contained in Paragraphs 1 through 73, above, and incorporates them herein the same as if they were set forth in their entirety.

75.    28 USC § 2201(a) provides that in a case of actual controversy within its jurisdiction, any court of the United States may declare the rights and other legal relations of any interested party seeking such declaration.

76.    Bankruptcy Rule 7001 provides that the following are adversary proceedings:

(1)    a proceeding to recover money or property, . . .

(2)    a proceeding to determine the validity, priority, or extent of a lien or other interest in property, . .

(3) – (8) . . .

(9)    a proceeding to obtain a declaratory judgment relating to any of the foregoing, . . .

77.    Section 541(a) provides that the commencement of a case under Sections 301, 302, or 303 creates an estate, and such estate is comprised of property, wherever located and by whomever held, including all legal or equitable interests of the debtor in property as of the commencement of the case.

78.    By this First Claim for Relief, the Trustee requests that this Court declare that as of the Petition Date:  (a) the Debtor owned both legal and equitable title to the Property; or (b) Meadow Farms and/or Bayuk, as the case may be, held only legal title to the Property, and that the equitable title to the Property was held by the Debtor, and, as such, the Estate.

79.     At the time of the purported Transfer, the Debtor was engaged in litigation with the Petitioners as well as other litigation and the Debtor, as well as Bayuk and Meadow Farms, knew the Debtor's interest in Virsenet and indirect ownership of USHF and the FCC Licenses via Virsenet was a very valuable asset.

80.     The purported Transfer to Bayuk and/or Meadow Farms, was a sham intended by Debtor and Bayuk to hinder, delay, and defraud creditors.  The Transfer was not intended to transfer both the legal and equitable title to the Property to Bayuk and/or Meadow Farms.

81.     After the Transfer, Debtor continued to exercise dominion and control over Virsenet and USHF and continued to receive the benefits of ownership of the sixty percent membership interest in Virsenet, the same as if the Transfer had not occurred.

82.     On April 20, 2012, $2,000,000 of the moneys deposited into the LMWF/USHF Trust Account by JJ/CD was transferred by LMWF to the Debtor's Bank of Montreal account ending in 620.  Between April 27, 2012 and August 14, 2012, the Debtor wire transferred at least $1,312,000 from his Bank of Montreal account to his Wells Fargo account ending in 5330.

83.     An additional $122,000 of the monies deposited into the LMWF/USHF Trust Account by JJ/CD was transferred by LMWF to the Debtor's Bank of Montreal account on May 3, 2012.

84.     On Debtor's Schedule I, Debtor stated under oath that he receives $31,250 a month as income, salary, and commissions as a "Consultant-Advisor."

85.     In 2013, the year immediately following the Debtor's purported transfer of his interests in Virsenet to Bayuk and Meadow Farms, Virsenet reported paying the Debtor $1,610,378 in nonemployee compensation, and USHF reported paying the Debtor $325,175 in nonemployee compensation. On Debtor's 2013 Federal Tax Return, a true and correct copy of which is attached

hereto as **Exhibit 27**, only a portion of this compensation is offset by non-reimbursed business expenses. At least a portion of the compensation was paid to Debtor after the Petition Date.

86.    In 2014, USHF reported paying the Debtor $430,707.92 in nonemployee compensation. All of these funds were paid to Debtor after the Petition Date.

87.    The Debtor has yet to file his 2014 tax return or produce all of his 2015 bank statements, so it is unknown what distributions or compensation the Debtor has received in 2014 or 2015 on account of his ownership interest in the Property in 2014 or 2015.

88.    The moneys and other consideration paid to Debtor by USHF and Virsenet as nonemployee compensation are distributions in consideration for and indicative of the continued ownership of the Property by Debtor and the equitable interests and right of the Trustee and Estate in the Property.

89.    The Property is a trust res.

90.    Defendants Bayuk and Meadow Farms gained the Property fraudulently and wrongfully.

91.    The Trustee is entitled to a judgment declaring that as of the Petition Date, the Debtor and the Estate held, and continues to hold, equitable title to the Property. As such, the Trustee is entitled to turnover of the Property from Defendants Bayuk and/or Meadow Farms.

For the reasons set forth above, the Trustee prays that this Court enter a judgment, pursuant to Sections 105(a), 323, 541, and 542: (1) declaring that, as of the Petition Date, the Debtor and the Estate held, and continue to hold, the equitable interests in the Property, being the sixty percent interest in Virsenet; (2) imposing a constructive trust for the Property; (3) recovering pre-judgment and post-judgment interest, attorneys' fees, and costs; and (4) granting such other and further relief as to the Court deems just and equitable under the circumstances.

## SECOND CLAIM FOR RELIEF

### Actual Fraud Pursuant to Sections 323, 542, 548(a)(1)(A), and 550(a)
### Against Defendants Bayuk, Virsenet, and Meadow Farms

92.    The Trustee repeats and realleges each and every allegation contained in Paragraphs 1 through 91, above, and incorporates them herein the same as if they were set forth in their entirety.

93.    Section 548(a)(1)(A) provides that a trustee may avoid any transfer of an interest of the debtor in property within 2 years of the filing of the petition if the debtor made such transfer with actual intent to hinder, delay, or defraud any entity to which the debtor was indebted.

94.    The Transfer to Bayuk/Meadow Farms in or about December 2012 was made with an actual intent to hinder, delay, and defraud creditors of the Debtor.

95.    At that time of the Transfer, in addition to moneys owed to other creditors, the Debtor was heavily indebted to the Petitioners by reason of the State Court Judgment, the Settlement Agreement, and the ability of the Petitioners to file the Confessed Judgment if the Debtor did not fulfill his obligations under the Settlement Agreement.

96.    The Debtor was fully aware of his obligations to the Petitioners and he was fully aware of the fact that the Property had substantial value and that it would be lost if the Petitioners were able to locate and execute a judgment against it.

97.    Evidence of the Debtor's intention to hinder, delay, and defraud his creditors includes, but is not limited to, the facts: (a) the Transfer was made to an insider as defined in Section101(31); (b) the Debtor retained dominion and control over the Property after it was purportedly transferred to Bayuk/Meadow Farms; (c) the Transfer was of a very significant portion of the Debtor's assets at the time; (d) the consideration the Debtor received for the Property was not

reasonably equivalent to the value of the Property; (e) the Debtor's claimed transfer of the Property is contradicted by filings with the FCC; (f) Debtor remained as the owner of the Property on the records of the FCC; (g) the Debtor listed the ownership interest on the BofA Financial Statement; and (h) the Debtor received proceeds from the sale of an interest in USHF.

For the reasons set forth above, the Trustee prays that this Court enter a judgment, pursuant to Sections 323, 548(a)(1)(A), and 550(a), and if the Court should determine that this action is governed by the laws of other states, the laws of such other states: (1) finding and concluding that the Transfer of the Property to Bayuk and/or Meadow Farms was a fraudulent transfer under the provisions of 11 USC § 548(a)(1)(A); (2) avoiding and preserving the Property free and clear from any claim of interest of the Bayuk and Meadow Farms and providing that the Trustee shall recover from Defendants Virsenet, Bayuk, and Meadow Farms, for the benefit of the Estate, the Property, or alternatively, if this Court so orders, the value of the Property; (3) directing that the Transfer be set aside; (4) recovering pre-judgment and post-judgment interest, attorneys' fees, and costs; and (5) granting such other and further relief as to the Court deems just and equitable under the circumstances.

### THIRD CLAIM FOR RELIEF

### Constructive Fraudulent Transfer Pursuant to Sections 323, 542, 548(a)(1)(B) and 550(a) against Bayuk, Virsenet, and Meadow Farms

98.    The Trustee repeats and realleges each and every allegation contained in Paragraphs 1 through 97, above, and incorporates them herein the same as if they were set forth in their entirety.

99.    11 USC §548(a)(1)(B) provides that a trustee may avoid any transfer of an interest of the debtor in property within 2 years of the filing of the petition if the debtor received less than

reasonably equivalent value in exchange for the transfer and the debtor was insolvent at the time of the transfer or was rendered insolvent as a result of the transfer or was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was unreasonably small.

100.    The $600 Debtor received from insiders Meadow Farms and/or Bayuk for the Property was not reasonably equivalent to the value of the Property.

101.    The Property was worth multitudes more than the $600 Debtor purportedly received from Meadow Farms and/or Bayuk.  In October 2011, USHF placed a value of $31,228,000 on ShipCom.  On this basis, the value of the Property was about $18,736,000.  In the BofA Financial Statement the Debtor submitted to Bank of America in April 2012, he indicated his sixty percent interest in VTS was worth $120,000,000.  Debtor testified at his 341 Examination that at the time he signed the BofA Financial Statement, he believed the "option" he held for the sixty percent membership interest in Virsenet was worth between $80,850,000 and $120,000,000.  In the USHF Restated Operating Agreement purportedly entered into in May 2013, only 6 months after the Debtor's transfer of his sixty percent interest in Virsenet to Meadow Farms, JJ/CD purportedly paid $10,976,452 for its 30% interest in USHF, which implies a value of $15,367,033 for sixty percent of the Virsenet membership interests.

102.    The Debtor was insolvent at the time of the Transfer or was rendered insolvent as a result of the Transfer.

103.    At the time of the Transfer the Debtor was engaged in business or a transaction, or was about to engage in business or a transaction for which any property remaining with the Debtor was unreasonably small capital.

///

For the reasons set forth above, the Trustee prays that this Court enter a judgment, pursuant to Sections 323, 548(a)(1)(B), and 550(a): (1) finding and concluding that the Transfer of the Property to Bayuk and/or Meadow Farms was a fraudulent transfer under the provisions of 11 USC § 548(a)(1)(B); (2) avoiding and preserving the Property free and clear from any claim of interest of Bayuk and Meadow Farms and providing that the Trustee shall recover from Defendants Virsenet, Bayuk, and Meadow Farms, for the benefit of the Estate, the Property, or alternatively, if this Court so orders, the value of the Property; (3) directing that the Transfer be set aside; (4) recovering pre-judgment and post-judgment interest, attorneys' fees, and costs; and (5) granting such other and further relief as to the Court deems just and equitable under the circumstances.

## FOURTH CLAIM FOR RELIEF

### Constructive Fraudulent Transfer Pursuant to Sections 323, 542, 548(a)(1)(B) (Transfer to Insider) and 550(a) against Bayuk, Virsenet, and Meadow Farms

104.    The Trustee repeats and realleges each and every allegation contained in Paragraphs 1 through 103, above, and incorporates them herein the same as if they were set forth in their entirety.

105.    Section 548(a)(1)(B) provides that a trustee may avoid any transfer of an interest of the debtor in property within 2 years of the filing of the petition if the debtor received less than reasonably equivalent value in exchange for the transfer and the transfer was made to an insider.

106.    For the reasons set forth in Paragraph 101, of the Third Claim for Relief, the Debtor did not receive reasonably equivalent value from Meadow Farms and/or Bayuk in exchange for the Property.

107.    The Trustee is informed and believes, and on that basis alleges, that Meadow Farms and/or Bayuk (the purported grantor of the Meadow Farms) were either insiders as defined in

Section 101(31) or non-statutory insiders of the Debtor at the time of the Transfer.

For the reasons set forth above, the Trustee prays that this Court enter a judgment, pursuant to Sections 323, 548(a)(1)(B) (Transfer to Insider) and 550(a): (1) finding and concluding that the Transfer of the Property to Bayuk and/or Meadow Farms was a fraudulent transfer under the provisions of 11 USC § 548(a)(1)(B); (2) avoiding and preserving the Property free and clear from any claim of interest of Bayuk, and Meadow Farms and providing that the Trustee shall recover from Defendants Virsenet, Bayuk and Meadow Farms, for the benefit of the Estate, the Property, or alternatively, if this Court so orders, the value of the Property; (3) directing that the Transfer be set aside; (4) recovering pre-judgment and post-judgment interest, attorneys' fees, and costs; and (5) granting such other and further relief as to the Court deems just and equitable under the circumstances.

## FIFTH CLAIM FOR RELIEF

### Intentional Fraudulent Transfer Pursuant to Sections 323, 542, 544, and 550(a) and NRS §§ 112.180.1(a) and 112.210 Against Bayuk, Virsenet, and Meadows Farms

108.    The Trustee repeats and realleges each and every allegation contained in Paragraphs 1 through 107, above, and incorporates them herein the same as if they were set forth in their entirety.

109.    Pursuant to Section 544, a trustee may avoid any transfer of property of a debtor that may be avoided by a creditor of the debtor under applicable state law. The Trustee may use the provisions of Nevada's Fraudulent Transfer Act (NRS Ch. 112) to avoid the Transfer.

110.    NRS § 112.180(1) provides that a transfer made with actual intent to hinder, delay, or defraud any creditor of the debtor may be avoided.

///

111.   The Transfer of the Property in December 2012, was made with an actual intent to hinder, delay, and defraud his creditors, including the Petitioners.

112.   At the time the Debtor transferred the Property to Meadow Farms, he was heavily indebted to the Petitioners by reason of the State Court Judgment, the Settlement Agreement, and the ability of the Petitioners to file the Confessed Judgment if the Debtor did not fulfill his obligations under the Settlement Agreement.

113.   The Debtor was fully aware of his obligations to the Petitioners and he was fully aware of the fact the Property had substantial value that would be lost if the Petitioners were able to locate and execute a judgment against it.

114.   Evidence of the Debtor's intention to hinder, delay and defraud his creditors includes, but is not limited to, the facts: (a) the Transfer was made to an insider as defined in Section101(31); (b) the Debtor retained dominion and control over the Property after it was purportedly transferred to Bayuk and/or Meadow Farms; (c) the Transfer was of a very significant portion of the Debtor's assets at the time; (d) the consideration the Debtor received for the Property was not reasonably equivalent to the value of the Property; (e) the Debtor's claimed transfer of the Property is contradicted by filings with the FCC; (f) Debtor remained as the owner of the Property on the records of the FCC; (g) the Debtor listed the ownership interest on the BofA Financial Statement; and (h) the Debtor received proceeds from the sale of an interest in USHF.

For the reasons set forth above, the Trustee prays that this Court enter a judgment, pursuant to Sections 323, 542, 544, and 550(a) and NRS §§112.180.1(a) and 112.210, and if the Court should determine that this action is governed by the laws of other states, the laws of such other states: (1) finding and concluding that the Transfer of the Property to Bayuk and/or Meadow Farms was a fraudulent transfer under the provisions of 11 USC §§ 544 and 550(a) and NRS §§

112.180(1) and 112.210; (2) avoiding and preserving the Property free and clear from any claim of interest of the Debtor, Bayuk, and Meadow Farms and providing that the Trustee shall recover from Defendants, Morabito, Bayuk, and Meadow Farms, for the benefit of the Debtor's Estate, the Property, or alternatively, if this Court so orders, the value of the Property; (3) directing that the Transfer be set aside; (4) recovering pre-judgment and post-judgment interest, attorneys' fees, and costs; and (5) granting such other and further relief as to the Court deems just and equitable under the circumstances.

## SIXTH CLAIM FOR RELIEF

### Constructive Fraudulent Transfer Pursuant to Sections 323, 542, 544 and 550(a) and NRS §§ 112.160, 112.180.1(b), 112.190 and 112.210 Against Defendants Bayuk, Meadows Farms and Virsenet

115.    The Trustee repeats and realleges each and every allegation contained in Paragraphs 1 through 114, above, and incorporates them herein the same as if they were set forth in their entirety.

116.    Pursuant to Section 544, a trustee may avoid any transfer of property of a debtor that may be avoided by a creditor of the debtor under applicable state law. The Trustee may use the provisions of Nevada's Fraudulent Transfer Act (NRS Ch. 112), and if the Court should determine that this action is governed by the laws of other states, the laws of such other states to avoid the Transfer.

117.    NRS. 112.190 provides that a trustee may avoid any transfer of an interest of the debtor in property if the action is commenced within 4 years of a transfer if the debtor received less than reasonably equivalent value in exchange for the transfer and the debtor was insolvent at the time of the transfer or the obligation or the debtor became insolvent as a result of the transfer or

///

obligation or was about to engage in business or a transaction for which any property remaining with the debtor was an unreasonably small capital.

118.    This Adversary Proceedings is being commenced within 4 years of the Transfer.

119.    The $600 Debtor received from insiders Meadow Farms and/or Bayuk for the Property was not reasonably equivalent to the value of the Property.

120.    The Property was worth multitudes more than the $600 Debtor purportedly received from Meadow Farms and/or Bayuk.  In October 2011, USHF placed a value of $31,228,000 on ShipCom.  On this basis, the value of the Property was about $18,736,000.  In the BofA Financial Statement the Debtor submitted to Bank of America in April 2012, he indicated his sixty percent interest in VTS was worth $120,000,000.  Debtor testified at his 314 Examination that at the time he signed the BofA Financial Statement, he believed the "option" he held for the sixty  percent membership interest in Virsenet was worth between $80,850,000 and $120,000,000.  In the USHF Restated Operating Agreement purportedly entered into in May 2013, only 6 months after the Debtor's transfer of his sixty percent interest in Virsenet to Meadow Farms, JJ/CD purportedly paid $10,976,452 for its 30% interest in USHF, which implies a value of $15,367,033 for sixty percent of the Virsenet membership interests.

121.    The Debtor was insolvent at the time of the Transfer or was rendered insolvent as a result of the Transfer.

122.    At the time of the Transfer the Debtor was engaged in business or a transaction, or was about to engage in business or a transaction for which any property remaining with the Debtor was unreasonably small capital

For the reasons set forth above, the Trustee prays that this Court enter a judgment, pursuant to Sections 323, 542, 544, and 550(a) and NRS §§ 112.160, 112.180.1(b), 112.190 and 112.210,

and if the Court should determine that this action is governed by the laws of other states, the laws of such other states: (1) finding and concluding that the Transfer of the Property to Bayuk and/or Meadow Farms was a fraudulent transfer under the provisions of 11 USC § 544 and NRS §§ 112.160, 112.180.1(b), 112,190 and 112.210; (2) avoiding and preserving the Property free and clear from any claim of interest of Bayuk and Meadow Farms and providing that the Trustee shall recover from Defendants, Virsenet, Bayuk, and Meadow Farms, for the benefit of the Estate, the Property, or alternatively, if this Court so orders, the value of the Property; (3) directing that the Transfer be set aside; (4) recovering pre-judgment and post-judgment interest, attorneys' fees, and costs; and (5) granting such other and further relief as to the Court deems just and equitable under the circumstances.

### SEVENTH CLAIM FOR RELIEF

**Injunctive Relief Pursuant to Section 105(a) and Bankruptcy Rule 7065**
**Against Defendants Virsenet, Bayuk, USHF, Meadow Farms, and LMWF**

123.    The Trustee repeats and realleges each and every allegation contained in Paragraphs 1 through 122, above, and incorporates them herein the same as if they were set forth in their entirety.

124.    Section 105(a) allows the Court to "issue any order, process, or judgment that is necessary or appropriate to carry of the provisions of this title." The Court may enjoin actions by both debtors and non-debtors where such actions would have an adverse effect on the debtor's assets or estate.

125.    For the reasons set forth herein, the Trustee has a high likelihood of success on the merits of this Adversary Proceeding with regard either of the alternative reliefs being sought, i.e.

/ / /

that the Property is property of the Estate pursuant to Section 541, or the Transfer was a fraudulent transfer under both bankruptcy law and Nevada state law.

126.    The Trustee and the Estate will suffer irreparable harm if an injunction is not entered as nothing will prevent the Defendants from continuing to distribute monies to the Debtor on account of his ownership interest in Virsenet and, indirectly, USHF, in an effort to hinder, delay, and defraud the legitimate creditors of the Estate.

127.    The Property has significant value, it is the most valuable asset of the Estate, and the Defendants have already distributed more than $3,000,000 to the Debtor through USHF and Virsenet to the detriment of the Estate and Debtor's creditors.

128.    On April 20, 2012, $2,000,000 of the moneys deposited into the LMWF/USHF Trust Account by JJ/CD was transferred by LMWF to the Debtor's bank account with Bank of Montreal. Between April 27, 2012 and August 14, 2012, the Debtor wire transferred at least $1,312,000 from his Bank of Montreal account to his Wells Fargo bank account and used those monies for personal expenses, including monthly lease payments for the Debtor's Bentley.

129.    An additional $122,000 of the monies deposited into the LMWF/USHF Trust Account by JJ/CD was transferred by LMWF to the Debtor's Bank of Montreal account on May 3, 2012.

130.    On Debtor's Schedule I, Debtor stated that he receives $31,250 a month as income, salary, and commissions as a "Consultant-Advisor." Yet, in 2013, the year immediately following the Debtor's purported transfer of his interests in Virsenet to Bayuk and Meadow Farms, Virsenet reported paying the Debtor $1,610,378 in nonemployee compensation, and USHF reported paying the Debtor $325,175 in nonemployee compensation.

///

131. In 2014, USHF reported paying the Debtor $430,707.92 in nonemployee compensation.

132. At least a portion of the non-employee compensation has been paid to Debtor since the Petition Date.

133. The Debtor has yet to file his 2014 tax return or produce all of his 2015 bank statements, so it is unknown what distributions or compensation the Debtor has received in 2014 or 2015 on account of his ownership interest in the Property in 2014 or 2015.

134. Thus, justice requires, to prevent further harm to the Estate and Debtor's creditors, that this Court enter an injunction prohibiting, enjoining, and restraining Virsenet, Bayuk, Meadow Farms, USHF, and LMWF, together with their members, managers, directors, officers, employees, and agents, from distributing any moneys or other consideration to or for the benefit of the Debtor without prior determination by the Court that all such proposed distributions are wages and commissions to Debtor exempt from property of the Estate.

135. The balance of hardships is in favor of the Trustee and the granting of injunctive relief. Any alleged harm to the Debtor is not cognizable as (a) the Property became Estate property as of the Petition Date, and (b) it is not the intention of the injunction to deny Debtor payment of post-Petition Date earned wages and commissions.

136. Granting an injunction is in the public interest because it will preserve the value of the Property for the benefit of the Estate and its legitimate creditors and is consistent with the purpose and intent of the Bankruptcy Code.

For the reasons set forth above, the Trustee is entitled, under Section 105 and Bankruptcy Rule 7065, to an injunction prohibiting, enjoining, and restraining Virsenet, Bayuk, Meadow Farms, USHF, and LMWF from distributing any moneys or other consideration to or for the benefit

of the Debtor without prior approval of the Court. Furthermore, the Trustee prays for an award of attorneys' fees and costs incurred in obtaining the equitable relief sought herein and for such other and further relief as to the Court deems just and equitable under the circumstances.

WHEREFORE, the Trustee prays for:

1.    The specific relief requested in each Claim for Relief set forth above;

2.    For costs and attorneys' fees as may be allowed by law; and

3.    For such other and further relief as the Court deems just and equitable under the circumstances.

DATED this / ˢᵗ day of February, 2016.

WOODBURN AND WEDGE

By_____

John F. Murtha, Esq.
Dane W. Anderson, Esq.
Seth J. Adams, Esq.
Attorneys for Trustee